This case this morning is 19-1708 Harold Hourihan v. Robert Bitinas et al. Good morning, your honors, and may it please the court, my name is Richard Latimer, from Falmouth, Massachusetts. I'm here as counsel for the plaintiff's appellant, Harold Hourihan. Basically what this is about, a jury verdict on a case that should never have been given to the jury. For the simple reason that the defendant's police officers had a burden to prove some exception to the warrant requirement before they entered Mr. Hourihan's house. Excuse me, counsel, you seem to indicate in your brief that the only exception to the warrant requirement that would suffice is an exception under the state mental health law. No, that's not actually what I argued. That was the specific point at which they arrived at his house. They were responding to a section 12 call. So you acknowledge there are other exceptions to the warrant requirement that might justify a home entry. Yes. Excuse me, Judge Burroughs, when she granted partial summary judgment, ruled, as I understand her opinion, that one of those exceptions was, at least theoretically, the community caretaking doctrine, and that the officers here were entitled to qualified immunity because the ultimate question as to whether the community caretaking doctrine would have permitted the entry was unsettled at the time of the entry, citing our decision in McDonald against Town of Easton, which was handed down within months of the actual entry in this situation. Now what's wrong with that rationale? In the first place, McDonald involved very different fact situations. I know it involved different situations, but McDonald said that the question at the time that these events occurred, the question was open as to whether the community caretaking exception justified, whether it was a justifiable exception to the warrant requirement sufficient to allow police officers in proper circumstances or inappropriate circumstances, that's another question, to enter a private home. The brief answer to that is the DeGeronimo case, which was settled at least a decade before this happened. A Massachusetts case that governed these police officers. No, the warrant requirement is constitutional. Yes. Massachusetts law doesn't trump federal law. And the DeGeronimo case was based upon Fourth Amendment principles. Yes. And principles of similar principles under our Constitution. The DeGeronimo case was a wellness check. And it reiterated the basic premises for any warrantless entry into a home is there must be a reasonable basis to believe that someone is inside the home who is at risk. That is for any case. The McDonald case did not negate that rule. In fact, specifically found that the officers had a reasonable basis to think that Mr. McDonald might have been in danger. And that was the same thing in the Entwistle case with warrantless entries. Excuse me. What do you do? As I understand it, the officers testified that he consented to the entry. So why isn't that certainly an exception to the warrant requirement? Because the Hoffman case, again, more than a decade before, said that once the officer fails to determine that there is some reasonable exigency to enter a home, the intrusion and investigation must stop. The officer must withdraw. But he could ask for consent. Asking for consent is continuing an investigation. So you're saying an officer has to have some degree of suspicion or probable cause to ask for consent? In this circumstance, yes. But we've never held that. Well, how does it make sense not to hold that? If you have to withdraw from a person's property, and by the way, this was Mr. Horahan's home. If you have to withdraw and stop your investigation because you have failed to articulate any specific facts to justify a continued investigation, how is it permissible for you to decide as a police officer, oh, well, I'm still going to continue this investigation by asking for consent? So let me ask you this. Without you waiving your argument, let's assume that it's okay to go into a person's house if you first ask for consent to go in, and you don't need to have some degree of cause to at least ask for the consent. If that were the law, then would you be out of luck in this case? I would suggest that if that were the law, the law is due for a change, because it seems like – Well, I think I hear you implicitly saying you would lose the case, but that isn't the law. That should not be the law. That is not consistent with the Fourth Amendment right to be secure in the person's house's papers and effects. That is totally inconsistent with that. To say that once you have no basis to continue an investigation, the police officer on his own without going to a magistrate decides, well, I'm going to continue this investigation by asking him for consent. So, excuse me, let me get the rule of law for which you're advocating. The rule of law is that a police officer who responds to what he thinks may be an emergency and finds out there is no emergency cannot enter a private dwelling even though the homeowner consents to that entry. Indeed, cannot even ask the homeowner to consent. That is essentially it. That's the rule of law for which you're advocating. The rule of law was that the investigation must end. The rule of law was that the officer had no right to even be on Mr. Horan's property after he found out there was nothing amiss. Suppose your client had asked him in for a cup of coffee. Excuse me? Suppose your client had asked him to come in for a cup of coffee. That would have been voluntary. That would have been clearly voluntary, but he didn't. Suppose instead he said to your client, could I come in for a cup of coffee? No, because that would have been an obvious move, as was the request for consent here, because what he said to Mr. Horan was, can I go in and make the gun safe? He said nothing about going in and seizing guns. So if we want, I'm saying we don't even have to get to that. But let's go beyond that. Let's suppose you're right. Let's suppose that the initial entry was justified for some reason. I can't imagine what it would be, but for some reason. Once Patinas entered the house, did his protective sleep, confirmed what he had been told, that there was nobody in the house, he was required at that point to leave again and not to ask for consent to continue a search. In fact, once he saw that there was nobody in the house, he was not even permitted to pick up and seize the gun that he saw. Why isn't your argument both affected and I would think almost barred by the facts that were pointed out in Judge Talwani's opinion that in the same time period that you're talking about, McKenna arrived, talked with Mr. Horan, was given a statement by Mr. Horan about what his neighbor across the road was trying to do, shooting poison pellets at him and deflecting them around to the back of the house. McKenna, in fact, went next door to see whether it would have been physically possible to do what Mr. Horan was saying, and he found that it was not. At that point, doesn't the, let's say, the exigency of a need to make sure that somebody is not going to be hurt by an actively paranoid individual justify further entry and further relationships with Horan? Why isn't that the answer to your argument? Well, there are several reasons. The most direct reason is that McKenna should never even have arrived. Patinas was required to withdraw and should have at that point called it in in case it is cleared that McKenna should never even have arrived. No, but before the point at which you say, as I understand it, before the point at which you say Patinas should have withdrawn, according at least to the recital of facts in the Telwani opinion, McKenna had arrived and was talking with Horan, and what one police officer knows is attributable to any police officer in the situation, and that is not the answer to your argument. No, because Patinas should never have had any information to give McKenna. He should have, first of all, from the beginning, this is clearly argued, that whole entry, that whole investigation was illegal ab initio after Patinas spoke with not just Horan, but with his pal Parker, who both told Patinas there was nobody in the house. That is a fact, by the way, that Judge Telwani conveniently omitted from her recital of facts, that Patinas knew not simply didn't have information that there was somebody might be inside, but knew there was nobody inside. Once he knew that there was nobody inside because he had credible information by two persons that there's nobody in the house, he was not even allowed to go in. And he had credible information to the effect that Horan was an active paranoid, and whether or not there were other people in the house, there was a justification for taking further steps to make sure that there were no instrumentalities in the house that this paranoid individual might use to hurt other people. Isn't that the legitimate argument? No, because the situation was under control. That's the Peters case. Once the officer has gone in and done a protective sweep and got everything under control, that's where it again ends and you have to go to a magistrate to get a warrant. That's very clear. These cases are Massachusetts cases relying on inciting Supreme Court cases under the Fourth Amendment, and they all put these officers on clear notice that once Patinas talked with Horan and Parker, saw that Horan was just a normal person, very cooperative, failed to even ask him about, well, what about that reporting person's claim that you're having some problems? Failed to even ask him if he was having any problems. Just looked at an empty holster and said, I'm going in. Asked, can I go in? To make the gun safe. Not to seize the gun. Not to do anything further. Once he went in the house, saw the gun was on the bed, saw nobody else was in the house, at that point there was no reasonable belief that anyone was inside at risk. At least none should have simply left. The gun was under Mr. Horan's control. He had prudently left it on the bed to go down to talk with a police officer. Had he put it in his holster and went down there, who knows what parade of horribles he might have anticipated. But he prudently left it on the bed, didn't try to hide the fact. If it was permissible for Patinas to enter at that point, fine. He goes in, does the protective sweep, nobody's in the house. That's the Commonwealth v. Peters case. That's very clear. Once he sees there's nobody in the house, unless he has some reasonable belief that still somebody's there, which he didn't articulate, he's got to leave. If he wants to do any more searching, fine, he can go to a magistrate and get a warrant. If this kind of police behavior is upheld by this court, as it was by the district court, then what is left of the Fourth Amendment right to be secure in a person's papers, houses, and effect. What can you say? All a police officer knows is I can just say it was consent. By the way, absurd, Mr. Horan is getting up in the morning ready to go to work. Police show up at his door. He carries a handgun because he delivers oil in the city and takes cash. Which the police do not know. They don't know why he's walking around with a holster. He didn't ask him. He should have asked. That was part of his obligation, by the way. Before you go, you ask questions. That's the Subo case. The Subo case was Subo v. District Attorney of Suffolk County. Much more involved legal issue, not as clear cut as this one, the question in Subo was what should the investigating officer have inquired of before deciding to seize the child. But in Subo and every other case that you've mentioned, there was no consent. You seem conveniently to overlook the significance of what is clear that this panel, at least, and the court, the district judge below, thinks is a significant fact. That the defendant consented, the jury found that consent to be voluntary. That is incorrect. That is incorrect. In the Rothman case, which is the seminal case I cited, there had been consent. The trial judge, I mean the motion judge, had found that there was consent, had acknowledged that there was consent. The SJC said, and Judge Hennessey in particular said, that didn't matter. Thank you.  Good morning, members of the panel. My name is Stephen Pfaff. I'm Lewis and Costello-Condon Pfaff, and I represent the defendant appellees Petinas and McKenna. I think Judge Sellier respectfully got it right with respect to the court's determination on qualified immunity on the warrantless entry, because the state of the law at the time was in flux. McDonnell was not decided until a few months, I think six months, after the events in this case. Why do we even get to that, if there was consent? Right. And I suggest to you there was consent. Consent actually to enter the house, and I think the jury found that. Wasn't there other consent? Didn't your client also testify there was consent to go to take him from the house? Yes. My client testified there was consent to place him in handcuffs and put him in the ambulance and then transport him to the hospital. Counsel, excuse me, perhaps you can clarify this for me. Certainly. There were two entries into the house? There were... One to do the protective sweep and then a subsequent entry? Correct. And did the jury find consent as to both entries or only as to the latter? The jury found consent to come in and search for the gun on the bed. There was no question... Which was the first entry or the second entry? The first entry. Yeah, okay. The first entry. The jury found that consent was given to go up and look on the bed and get the weapon, which I suggest to you that's... The bed is in the bedroom. The bedroom is in the house. That's consent to go into the house at that point. So the second entry, Judge Shelley, was a combined entry with Batinas and McKenna after McKenna had spoken with the plaintiff. That's true. So, respectfully, even though Judge Burroughs decided the issue of warrantless entry on qualified immunity, the jury also found that consent, or the officers had a reasonable basis to go in, was given to... So, I'm sometimes easily confused, counsel. Are you saying we don't have to review Judge Burroughs' ruling even though there's an assignment of error addressed to it because the subsequent jury verdict somehow validated the summary judgment ruling? I think, Judge... No, I think you have to look at the summary judgment decision by Judge Burroughs based on qualified immunity. But if you don't like that argument on qualified immunity, very respectfully, the first question posed to the jury was, was consent given to go up on the bed to get the gun? Let me put my question another way. So if for any reason we think the summary judgment ruling was error or may have been error, you're saying the error is clearly harmless in light of the jury verdict? No question about it. Because even though there wasn't a specific question, i.e., was consent given by the plaintiff to enter the house, there was a specific question given, did the officers have consent to go up and look at the gun on the bed? And you imply the fact that it's consent to come into the house because you can't get up to the bedroom until you get through the threshold of the house. And then what about the second entry? The second entry was after Patinas had come down to inform McKenna, who by that time had already spoken with the plaintiff, had gone over across the street to see if he could affirm the allegations being made by the plaintiff. Realizing that he couldn't, he came back, Patinas spoke with him, found out from McKenna, found out from Patinas what he had seen upstairs and what he had done, and the second entry went in. I mean, there wasn't any issue of consent. There's no issue raised, actually, by the plaintiff about this second entry into the house. So I suggest to you the first entry into the house on consent covered the second entry into the house with respect to Patinas and McKenna. How was, in the special verdict form, there was a reference to search under Hurahan's bed. Right. And then there was a separate question, search elsewhere in the bedroom. Correct. And there was consent raised as a defense in both of those. Correct. And then there was search elsewhere in the home. Is that the second search? The second search would have been, would have taken place, the search throughout the home would have taken place on the second entry. But they found there was no search elsewhere in the home. That's correct. So you didn't even get to consent on that? Did not on that point, correct, Your Honor. So what is the second, was there a question about the second entry? There was not a question about the second entry. There was a question about entries being made by, well, there was a question with respect to Patinas, okay, and that's the first entry into the house, as well as the second. Then there's a question, a set of questions to McKenna. McKenna made the second entry coterminously with Patinas. So there were questions with respect to that. So was there a claim that the second entry is a source of liability? No, no, he has not argued that. My brother has argued that it's the first entry in by Patinas that goes to liability, and thereafter, everything after that is effectively the fruit of the poisonous tree. So that's why the jury wasn't asked about the second entry. Correct. If Your Honor has any questions with respect to the knowledge of Patinas when he arrived at the scene after the call, I'm happy to point out on Volume 3, Page 1, is the dispatcher report that Patinas received. Patinas didn't enter the house simply because he saw somebody with an empty holster on his belt. He entered the house because the call came in by the reporting person, the next-door neighbor. She had made statements to the effect that he believes the state police are in his attic spying on him. People are shooting BB guns in his backyard, throwing water balloons from her parents' property, among other things. She believes him to have accidentally discharged firearms in his home in the past, but does not know if he still possesses weapons. So to the extent that my brother makes the argument that there was no issue whatsoever after Patinas talked and had this conversation with the plaintiff, it doesn't end right there. As Justice Souter mentioned, there's a heightened sense of scrutiny there, a heightened sense of concern, I think, when you get this information relayed to you about somebody who has a gun, who's been acting very erratically, and then appears to you for the first time with an empty holster. And the mental capacity of the plaintiff is further at issue, if you will, after his conversation with McKenna, who goes across the street to try to confirm everything that the plaintiff had said, and realizes that's not possible, and comes back and then talks with Patinas. So for all those reasons, Your Honor, I'd ask that you affirm the decision of the jury and affirm the decision of Judge Teller. Thank you. Thank you, counsel.